THE EAST TENNESSEE AND GEORGIA RAILROAD COM-
PANY, plaintiff in error, *vs.* JAMES MONTGOMERY, defend-
ant in error.

Where a letter was written to B, at Rome, by the agent of the East Ten-
nessee and Georgia Railroad Company, in response to inquiries made
by B, in which he states that "arrangements are perfected for send-
ing cotton through to New York *via* East Tennessee and Georgia and
connecting lines to Alexandria by rail, and from thence by steamer,
without detention, etc., etc., our rate from Dalton to New York on
cotton is $9 00 per bale. Hoping to secure a liberal share of business
from Rome, I am," etc., and this letter was shown to Montgomery,
who shipped his cotton to Kingston, on the Western and Atlantic Rail-
road, and by the way of Dalton over the East Tennessee and Virginia
Railroad through to New York, and damages were incurred by delays
upon the route, after it had passed over the road of the defendant:

*Held*, That the letter written to B, by the Railroad agent, when shown
to Montgomery, did not, without some notice to the Railroad by him,
that he had shipped his cotton, via Kingston to Dalton, to be shipped
by them in terms of such letter, constitute in itself, an express con-
tract, so as to bind the company for loss or delay occurring beyond its
terminus.

The contract imposed by the law, (see Code, 2058,) was to deliver to the
connecting road in good order and due time, and to impose a greater
liability required an express contract, and the letter addressed to B,
did not, upon being read by Montgomery, constitute such an express
contract. And his act of sending the cotton, without notice to the com-
pany, coming over another road and transported by them as an inter-
mediate line, could not be regarded as embracing the terms of an ex-
press contract, arising out of the letter to B, as between such con-
signor without notice and such road.

Where the Court, upon the trial, gave in charge to the jury principles of
law contravening the law stated, it was error, and a new trial should
have been granted. WARNER, Judge, dissenting.

A witness used a memorandum in answering interrogatories, which was
not attached to his answers. During the trial the Judge refused to
rule out his answer, only so far as they were connected with said
memorandum. The defect was one of execution, and the ruling of
the Judge was right. (R.)

Common-carriers. Interrogatories. Before Judge PAR-
ROTT. Whitfield Superior Court. January, 1871.

The following letter was received by one Bayard :

" EAST TENNESSEE AND GEORGIA RAILROAD COMPANY'S
SUPERINTENDENT'S OFFICE.

" CHATTANOOGA, October 28th, 1865.

" N. J. BAYARD, Rome, Ga. :

" *Dear Sir :* — Yours of 21st came duly to hand. In re-
ply, I will say that arrangements are perfected for sending
cotton through to New York *via* East Tennessee and Georgia
and connecting lines to Alexandria by rail, and from thence
per steamer, without detention, and with less transfers than
any other line. There are three regular lines of steamers
from Alexandria to New York, so that there will not be any
detention at that point. Our rate from Dalton to New York
on cotton is $9 00 per bale. Hoping to secure a liberal share
of business from Rome,

" I am, very respectfully, your obedient servant,

" A. A. TALMAGE, *Superintendent.*"

Talmage was the superintendent of the East Tennessee and
Georgia Railroad Company. Bayard shipped some cotton
through from Rome, on the 30th of October, 1865. On what
terms he shipped it, or whether he had then received said
letter, does not appear.

Afterwards he showed this letter to Montgomery, or read
it to him. Without knowing that it was genuine, except by
Bayard's statement, and knowing nothing about the rates,
etc., of the East Tennessee and Georgia Railroad Company,
except as therein stated, Montgomery put *his* cotton in charge
of the Rome Railroad, billed through to New York. Freight
was to be there paid, and it was to be sold on arrival. It
did not appear that any intermediate agent knew of Tal-
mage's letter, or of any such arrangement, except that these
connecting roads had a through freight bill from points South
to New York. Over that road it passed to Kingston, thence
over the Western and Atlantic Railroad to Dalton, thence

over the East Tennessee and Georgia Railroad to Knoxville, where it was safely and in proper time delivered to the East Tennessee and Virginia Railroad Company. After that it was delayed while *en route*. During this delay the price declined, and Montgomery sued the East Tennessee and Georgia Railroad for the amount lost by him by this decline.

The defense was that the cotton was promptly delivered to the connecting road " as in good order." The reply was, that the facts made a special contract by which the East Tennessee and Georgia Railroad was liable for the damage without regard to where the delay occurred.

All these facts, and the quantum, decline, etc., were shown upon the trial. Pending the trial, a motion was made to rule out a set of interrogatories because the witness answered from memoranda which had not been attached to his answers and certified by the commissioners who took his answers. What the evidence was or what the memoranda were do not clearly appear. The Court refused to rule out the whole of the answers, but did rule out all relating to the memoranda. He charged the jury that " said letter is not proof of a special contract between the plaintiff and defendant, but may constitute evidence of what the East Tennessee and Georgia Railroad were engaged to do at the time it was written. The Court construes this letter as evidence of the undertaking of the defendant to ship cotton from Dalton to New York for parties who might see proper to ship over that road. If plaintiff did ship cotton over the line mentioned in the letter, and if defendants were then engaging to ship through to New York for a certain price, at a certain shipping rate this would authorize the jury to take the case out of section 2058 of the Code, which makes the last road receiving the goods " as in good order " responsible for loss in shipment, and the several lines of railroads and steamers over which the cotton was to pass were agents or employees of defendant, aiding to carry the cotton through to New York, and upon which plaintiff had no claim for failure to perform their undertak-

ing." If defendant was not undertaking to carry to New York at a certain rate it might relieve itself under section 2058 of the Code. But if defendant agreed to ship through to New York at a certain rate, and plaintiff shipped under that arrangement, or while defendant was shipping, or offering to ship, thus for the public; or if defendant failed to deliver the cotton to the connecting road in good order and in a reasonable time, plaintiff can recover damages for his loss caused by the delay, unless this delay was from the act of God or the public enemy." Said letter is evidence of the undertaking of defendant to ship cotton from Dalton to New York for parties who might see proper to ship over that road. He refused to charge that, as to the time of delivery, ordinary diligence only was required; and accident or misfortune, though not the act of God, causing delay would not make a common-carrier liable if it used reasonable diligence to avoid the delay.

The jury found for the plaintiff. Defendant moved for a new trial upon the grounds that the verdict was contrary to the evidence; that the Court erred in not rejecting the whole of the answers to said interrogatories, and in charging as he did, and refusing to charge as requested. He refused a new trial, and that is assigned as error.

D. A. WALKER; McCUTCHEN & SHUMATE, for plaintiff in error. As to special contract: 43 Ga. R., 641. As to delay in delivering: Story on B., sec. 545, (*a*); 14 Wend. R., 216; Ch. on Car., 56, note; R. Code, sec. 2047; Ang. on Car., sec. 289, note.

PRINTUP & FOUCHE; W. H. DABNEY, for defendant.

LOCHRANE, Chief Justice.

James Montgomery brought his action against the East Tennessee and Georgia Railroad Company to recover damages resulting from the delay in transportation of cotton

from Rome to the city of New York. The damages proven and found by the jury amounted to $2,000. Upon a motion for a new trial various grounds were assigned, all, however, controlled by legal principles involved in the construction of a letter set up, with the surrounding facts, as an express or special contract, upon which the liability of the defendant below is predicated.

The proof shows that Montgomery shipped the cotton from Kingston, Georgia, at a station on the Western and Atlantic Railroad, consigned to parties in New York. The cotton was received in due course at Dalton, by the East Tennessee and Georgia Railroad, and was, by them, transported over their line to their terminus at Knoxville, and, as in good order and in due time, delivered to the connecting road *en route,* or the East Tennessee and Virginia Railroad Company. The delay occurred after it left the custody of the defendant and its delivery to the connecting road. Under our Code, section 2058, defining the liability of railroads, this defendant was liable only to its terminus and for the delivery of the property to the connecting road in good order. But the difficulty of this case, if any exists, originates in the fact that A. A. Talmadge, Superintendent of the East Tennessee and Georgia Railroad Company, on the 25th October, 1865, and previous to the shipment, addressed a letter to Mr. Bayard, of Rome, in which letter he says: "Yours of the 21st came duly to hand. In reply, I will say that arrangements are perfected for sending cotton through to New York *via* East Tennessee and Georgia and connecting lines to Alexandria by rail, and from thence, by steamer, without detention, and with less transfers than any other line. There are three regular lines of steamers running from Alexandria to New York, so that there will not be any detention at that point. Our rate from Dalton to New York on cotton is nine dollars, ($9 00) per bale. Hoping to secure a liberal share of business from Rome, I am, etc.,

"A. A. TALMAGE, *Superintendent."*

This letter was shown or read to Montgomery, and he, acting upon it, sent his cotton from Rome to Kingston, at which latter point it is forwarded through as freight. Did this letter constitute an express contract, by which the general liability of the East Tennessee and Georgia Railroad was increased as to Bayard, the party to whom it was addressed? I think it did. It contained a proposition in writing to transport cotton to New York. This was its fair purport of construction. It presented inducements to secure the shipments. It was addressed to him, and when accepted by him, either by a response in writing or by acts equivalent, as by shipment of his cotton, my opinion is it was an express contract upon the part of the road, and accepted by him to carry his cotton to New York, and I think the railroad company, taking the benefits under it, would be, in law, justly bound, by its terms. But, conceding this proposition, did the reading of this letter to Montgomery make the defendant occupy, as to him, the same legal *status* or relationship? I think not. It is true, the letter concludes by hoping to receive patronage from Rome; but this could not fairly be held to constitute a contract for carriage with any party in Rome who may have seen, read, or heard read this letter. Therefore, in itself, it did not constitute any contract between a stranger and the railroad company. What other proof is developed by the record to aid in giving to this letter that effect? Montgomery acted upon it by sending his cotton *en route* over that road, and by the line indicated. This is all. But Montgomery, in acting upon it, delivered his cotton to the railroad at Kingston, and from that point it went over the East Tennessee and Georgia Railroad, as any other freight, and, consequently, did not come within any notice or knowledge of the railroad company, that it was shipped by express contract with them, invoking their attention farther than over their own line and to the connecting line at their terminus, receiving it "as in good order." Therefore neither the *seeing* of the letter, nor the mode of shipment, constituted an express

contract as between the railroad company and Montgomery. The link which is absent and nowhere seen by the evidence, is notice by Montgomery of the shipment, as included in the terms of the letter to the railroad company. If Montgomery, being advised of this letter, and properly construing its terms to be a proposition to ship through to New York by connecting lines, and inviting shippers from Rome to patronize it, upon such terms, had notified the East Tennessee and Georgia Railroad that he had so shipped to them, under the proposition contained in the letter to Bayard, then, by this notice to them, he would have been entitled to claim the damages occasioned by the delay upon the line, even though accruing after it left the hands of the defendant and was delivered to connecting lines.

It is useless to discuss the doctrine of railroad liability by express contract. This I did in cases at the last term. I simply, in this case, confine myself to the facts and the opinion I entertain upon them as to whether this letter, under the evidence, constituted an express contract. And, with the view I hold, it is unnecessary to travel through the various assignments of error to the charges of the Judge. I think the law of the case entitled the party to a new trial upon the main and controlling ground in the case.

In relation to the judgment of the Court refusing to strike out the interrogatories of Montgomery, only so far as they related to memorandums not attached, I am of opinion the decision was correct. Under section 3835, all exceptions to the execution must be made in writing, and notice given before the trial, when the interrogatories have been in office, etc., and when a witness answers from memoranda, under section 3831, such memoranda should be sent with the commission and certified to by the commissioners. These objections were made upon the trial, and the defect went to the execution, and when made upon the trial, the ruling of the Court accomplished substantial justice, by rejecting the questions improperly answered, but receiving that not subject to the objection. Judgment reversed.

McCay, Judge, concurs.

I concur in the judgment of reversal in this case. I think the charge of the Court was error. In my judgment, there was no evidence of any contract of the East Tennessee and Georgia Railroad to carry this cotton to New York, and that it was error to charge the jury that they might consider from the letter and from Montgomery's acts, whether there was an undertaking so to do. The charge also informed the jury that though the letter was not, of itself, evidence of such a contract, it was evidence that the road was then making such contracts and doing such business. In the first place, I am inclined to the opinion that, under our law, this letter was not even an offer to Bayard, by this road, to carry his cotton to New York. Fairly construed, what does this letter amount to? Simply this, that an arrangement had been made between the different connecting lines to carry cotton through from Dalton to New York, without detention, for $9 00 per bag. By the law of England, and by the decisions of the Courts of most of the American States, it is true that a receipt of freight, destined to a distant point, binds the receiptor, who is a common-carrier, to its destination, and especially is this true, if the freight be agreed to be paid in advance or at the end of the line.

But our Code, section 2058, provides that " if there be several connecting railroads, and goods be intended to be transported over more than one road, such road shall only be liable to its own terminus and until delivery to the next connecting road." At our last term, this Court decided in the case of *The Western and Atlantic Railroad vs. McDonald & Strong,* that the mere receipt of goods destined to a distant point, and stated in the receipt as intended to be transported over several roads, even on a through rate, was not, under this section of the Code, such a contract as bound the receipting road for the whole distance. We then held that this section of

the Code contemplated just such a case, and that the putting of the intention into writing did not alter the law. If goods are intended to pass over different roads, and be delivered by one road to the other, it must be that the freight over the whole line is to be paid at one end of the line ; since, if this were not done, the goods must stop. I do not think there is anything in this letter, even as to Bayard, to make this case different from the case I have referred to. It is, at last, nothing but a statement in writing of the very case put by the Code, to-wit : there are several connecting roads, the goods are to be transported over more than one road, and to be delivered direct from one road to the next without any intermediate consignee or agent to pay the freight and tranship the goods. Nor does the use of the word "our" in the letter make the case different. Very clearly, the writer means by that word our—not his road—but all the roads.

But admitting that, as to Bayard, this letter, if he acted under it, was a special contract, is it a special contract as to Montgomery, if he acted upon it ?

Now, I do not say a special contract must always be by words on both sides. One may say I will do so and so, if you will do so and so. If the person addressed acts, and lets the other know he has acted, this is the same as if he had agreed in words. What is the case here ? Montgomery sees the letter ; it was not addressed to him ; he acts upon it and starts his cotton from Rome, destined to New York. He gives no notice that he has acted. He never deals with this road at all. The cotton comes to this road under a list or freight bill, from Kingston to New York. When this cotton went into the hands of this road, it went there as cotton delivered to the Western and Atlantic Railroad, at Kingston, to be sent from there to New York, on a through freight list from Kingston to New York. The only evidence there is that the defendant ever had this cotton in possession at all, is from its own books which, by the very same entries, show that the cotton came to this road from the Western and At-

lantic road, on a through freight list, not from Dalton to New York, but from Kingston to New York. How was this road to know that its through passage to New York was to begin at Dalton? It came to hand attended, as the books show, by a through freight list from Kingston to New York. The East Tennessee and Georgia Railroad was the second road on the line, not the first, as shown by the freight list accompanying the cotton. How were they to know, without any notice, that Montgomery intended its through passage to start at Dalton? The evidence shows that, in fact, it started as through freight from Kingston, and not from Dalton. As this road appears to have done its full duty, and as it, so far as its officers knew, was the second road on the line, and, as they had no notice that Montgomery was looking to them as the first, in my judgment they are only liable over their own line. This was a Georgia contract, and is to be regulated by Georgia law—our Code—and the road is liable who lost the cotton. This is easily ascertained. Every road keeps accurate books, and is able to show, in every case, if they have delivered goods to the next road.

WARNER, Judge, dissenting.

This was an action brought by the plaintiff against the defendant, to recover damages for the loss and detention of cotton shipped by the plaintiff on the defendant's road, on or about the 5th of November, 1865, on the faith of, and in consequence of the following letter, written to N. G. Bayard, at Rome, Georgia, by A. A. Talmadge, Superintendent of the East Tennessee and Georgia Railroad:

"EAST TENNESSEE AND GEORGIA RAILROAD COMPANY,

SUPERINTENDENT'S OFFICE,

"CHATTANOOGA, October, 25th, 1865.

" N. G. BAYARD, Rome, Georgia:

" *Dear Sir :*—Yours of the 21st came duly to hand. In reply, I will say, that arrangements are perfected for

sending cotton through to New York *via* East Tennessee and Georgia and connecting lines to Alexandria by rail, without detention, and with less transfers than any other line. There are three regular lines of steamers running from Alexandria to New York, so that there will not be any detention at that point. Our rate from Dalton to New York on cotton is $9 00 per bale. Hoping to secure a liberal share of business from Rome. I am, very respectfully, your obedient servant, A. A. TALMAGE, *Superintendent.*"

This letter was shown to the plaintiff before shipping his cotton from Rome, so as to reach the defendant's road, over which it was intended to go, and was received by the defendant on its road, to be transported to New York. There is no dispute that the cotton was detained on the route between Dalton and New York, or as to the *inability* of that line of road to transport cotton over it without detention and delay. The plaintiff's damages are clearly proved by the evidence, resulting from the detention of the cotton on the line of road between Dalton and New York, and the verdict of the jury is just and reasonable, under the evidence. But the defendant contends that he is not liable beyond the terminus of his own road, under his contract and undertaking in this case, for the detention of the cotton, which occurred on the line of road between Dalton and New York, in consequence of the *defective* means of transportation on *that line of road.* What is the fair and legal construction to be given to the defendant's letter, written to induce the shippers of cotton at Rome, Georgia, to send their cotton over his road ? It was an undertaking on his part that his road would ship cotton to New York, the point of destination, either by its own company or competent agents, for $9 00 per bale, without *detention*, which was an important consideration to shippers, in view of the condition of the various lines of railroad at that time. The defendant knew, when he wrote that letter, that parties shipping cotton from Rome, to be shipped over his road, would forward it over the Rome and West-

ern and Atlantic roads, to be shipped over his road to New York, and it was to induce them to do so that the letter was written. Contracts implied by law are such as reason and justice dictate, and which, therefore, the law presumes that every man has contracted to perform; and upon this presumption, makes him answerable to such persons as suffer by his non-performance: 3 Blackstone's Commentaries, 154. The undertaking of the defendant in his letter was, that if the shippers of cotton at Rome would ship it over his road to New York, he had perfected arrangements for sending cotton through to New York *via* East Tennessee and Georgia and connecting lines to Alexandria by rail, without *detention,* and from thence to New York by steamers, at the rate of $9 00 per bale from Dalton to New York. Having failed to perform this undertaking, the law makes him answerable to the plaintiff for the damages he has sustained by his *non-performance* of it. In the absence of any express contract to that effect with the plaintiff, the law will imply one from his letter, and from the fact that the plaintiff did ship his cotton over the defendant's road to New York at the rate of $9 00 per bale, in pursuance of the terms of that letter, and which he undertook to safely deliver at the point of destination, without any *unreasonable detention,* either by himself or his competent agents, with whom he said he had made arrangements for that purpose. To allow the defendant now to repudiate that undertaking would be a fraud on the plaintiff, who shipped his cotton over the defendant's road, on the faith of it. I am, therefore, of the opinion that the judgment of the Court below in this case should be affirmed.